IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **BARNA CONSHIPPING, S.L.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 09-0027-KD-C |
| | ) |
| **1,800 METRIC TONS, MORE OR** | ) |
| **LESS, OF ABANDONED STEEL,** | ) |
| | ) |
| **Defendant.** | ) |

**ORDER**

Presently on deck are Commercial Metals Company d/b/a CMC Dallas Trading's ("CMC") Motion to Dismiss Rule B, C and D Claims (Docs. 39, 40), Plaintiff's Notice of Dismissal of Rule D Claims (Doc. 45), Plaintiff Barna Conshipping, S.L.'s ("Plaintiff") Opposition (Docs. 46, 47), CMC's Motion for Leave to File Reply Brief and Set Rule E(4)(f) Hearing (Doc. 57), Plaintiff's Opposition (Doc. 58, 59, 60), CMC's Reply (Doc. 62) and Plaintiff's Sur-Reply (Doc. 66).

**I.    Factual Background**[1]

Before endeavoring to plunge into the murky waters of Plaintiff's case, the Court finds it appropriate to, at the outset, get its bearings by setting forth the following pertinent factual information. This case involves a contractual dispute surrounding the importation of steel on a vessel by the sea from Barcelona, Spain, to Mobile, Alabama. The entities involved include as follows. Plaintiff Barna Conshipping, S.L. ("Plaintiff") is a Spanish company who is the Charterer of the M/V SATURNUS vessel. Non-party Compania Espanola de Laminocion, S.L. ("CELSA");

---

[1] Based on the record as well as Plaintiff's counsel's representations at the hearings which have been held in this case.

CELSA is a Spanish manufacturer of steel and the Seller and Shipper of the cargo.[2]  Defendant Commercial Metals Company d/b/a CMC Dallas Trading ("CMC") is a Texas corporation and the Purchaser of the cargo as well as Consignee on the CELSA-CMC Bills of Lading.  Non-party Oldendorff GmbH & Co., KG ("Oldendorff"), is an Ocean Carrier and is the listed Owner on the Plaintiff-Oldendorff Charter Contract.  The vessel involved in this case is the M/V SATURNUS.  Norton Lilly International is the substitute custodian.

In October 2008, CMC entered into a Purchase Agreement with CELSA (the "CELSA-CMC Purchase Agreement"), to purchase (in relevant part) approximately 1,828.568 metric tons of wide flange steel beams, to be delivered by vessel to Mobile, Alabama.  According to Plaintiff, CELSA then contracted with Plaintiff to transport the steel cargo to various ports in the United States, including Mobile, Alabama.[3]  Plaintiff subsequently contracted with Oldendorff and executed a Charter Contract (the "Plaintiff-Oldendorff Charter Contract"), under which it voyage chartered the M/V SATURNUS vessel to transport the cargo.  Pursuant to the Plaintiff-Oldendorff Charter Contract (Doc. 66 at Ex. B, Docs. 35-2 to 35-5) (a voyage charter agreement), Plaintiff (as the Charterer) was contractually obligated to pay Oldendorff (the Owner) for all of the detention costs of the M/V SATURNUS vessel at the rate of $15,000/per day (demurrage charges), for each day that the vessel was delayed in its offloading of the cargo: "[d]emurrage at the loading and discharging port is payable by the Charterers at the rate stated . . . ."  (Doc. 66-3 (Clause 7)).  Also under this Charter Contract, Oldendorff, not Plaintiff, had a lien on the cargo and for any demurrage: "[t]he Owners

---

[2] Plaintiff's oral representations at several hearings held in this case assert that CELSA is the parent company of Plaintiff.  However, Plaintiff has provided no evidentiary support for this assertion.

[3] Plaintiff has not submitted any evidence regarding the agreement between Plaintiff and CELSA.

shall have a lien on the cargo and for freight, deadfreight, demurrage . . . ." (Id. at Clause 8).

Thereafter, upon the loading of the cargo on the M/V SATURNUS in Barcelona, Spain, CMC asserts that it notified CELSA that the cargo was damaged and that the manner in which it was being loaded would cause additional damage during the Atlantic crossing, such that the cargo did not satisfy the contract specifications of the CELSA-CMC Purchase Agreement. CMC asserts that CELSA did not respond to these concerns and that the Master of the vessel M/V SATURNUS fraudulently issued clean Bills of Lading indicating that there was no damage to the cargo and sent the cargo on its way. The vessel was expected to arrive in Mobile, Alabama, on or about January 15, 2009, or shortly thereafter. "Cogen Bills of Lading" were issued, naming CMC as the Consignee and CELSA as the Shipper and Oldendorf as the Carrier. As indicated on these Bills of Lading, the terms included "FREIGHT PREPAID" and "FO." CELSA paid the freight[4] to Oldendorff.

According to the record, on January 15, 2009, CMC notified Plaintiff that it would not accept delivery of the cargo or make arrangements for offloading because the cargo had been damaged upon its loading on the M/V SATURNUS in Spain. Plaintiff asserts that it incurred demurrage charges commencing on January 16, 2009, and that it has a maritime lien for these demurrage charges against CMC's interest in the cargo.

## II.     Procedural Background

On January 15, 2009, Plaintiff initiated this action by filing a Verified Complaint and request for issuance of warrant of maritime arrest pursuant to Rules C and D of the Supplemental Admiralty Rules (and motion for same), with regard to approximately 1,800 metric tons of "abandoned steel"

---

[4] Freight refers to a carrier's charge for the transportation. 2 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 10-6 (4th ed. 2009).

cargo. (Docs. 1, 3, 4). On January 16, 2009, the Court authorized a warrant for the arrest of the cargo pursuant to Rule C of the Supplemental Rules of Admiralty and based upon Exhibit E to Plaintiff's Complaint (outlining charges allegedly owed on cargo unloaded in Norfolk, Virginia as well as Plaintiff's representation that it incurred $15,000 in damages on January 16, 2009). (Doc. 12). Also on this date, Plaintiff filed a First Amendment to its Verified Complaint (Doc. 8), and CMC filed a Notice of a Rule E(8) restricted appearance and a Verified Statement of Right of Interest in the cargo. (Docs. 9, 10).

On February 13, 2009, CMC filed a Supplement to its Verified Statement. (Doc. 35). On February 18, 2009, Plaintiff filed a Second Amendment to its Verified Complaint, in which it asserted Supplemental Admiralty Rule B: "Barna brings this action against CMC, *in personam*, pursuant to Supplemental Rule B to recover costs which Barna has incurred as a direct and proximate consequence of the failure and refusal of CMC to accept delivery or possession of the Abandoned Cargo." (Doc. 36). On February 20, 2009, CMC filed an Answer in which it asserted, in part, that there is no basis for admiralty subject matter jurisdiction and that the Plaintiff is barred from any relief because of its failure to possess a maritime lien against the cargo and its willful and wrongful arrest of the cargo. (Doc. 38). On this same day, CMC filed a motion to dismiss Plaintiff's Rule B, C and D claims, stating that admiralty jurisdiction is lacking and that the Rule C claim is due to be dismissed and the warrant of arrest is due to be vacated because Plaintiff has no maritime lien. (Docs. 39, 40). On March 10, 2009, Plaintiff responded, stating that CMC's "non-payment of charges due and arising from certain contracts" constitutes a maritime lien, which creates admiralty jurisdiction, providing Plaintiff with Rule B and C remedies. (Doc. 46, 47). Also on this day, Plaintiff filed a Notice of Dismissal of its Rule D Claims. (Doc. 45).

4

On March 13, 2009, Plaintiff filed a motion for writ of maritime attachment and garnishment under Rule B, citing CMC's non-payment for costs of the cargo's transportation, unloading and storage, as grounds. (Docs. 48, 49). On March 17, 2009, the Court denied Plaintiff's motion for failure to comply with Rule B(1)(b) of the Supplemental Admiralty Rules (requiring that an affidavit be filed, with such a motion, stating that the defendant cannot be found within the district). (Doc. 50). On March 24, 2009, Plaintiff filed a second motion for writ of maritime attachment and garnishment under Rule B, seeking an attachment as to the 1,800 tons of cargo, and filed an affidavit in support thereof. (Doc. 53, 54, 55). On this same day, Plaintiff filed an amended second motion for writ of maritime attachment and garnishment under Rule B; in so doing, Plaintiff did not indicate the reason for the amendment. (Doc. 56). On April 14, 2009, the Court denied Plaintiff's motion for a Rule B attachment. (Doc. 67).

On April 15, 2009, the Court held a Rule E(4)(f) hearing regarding the propriety of the Rule C arrest issued in this case and ordered additional briefing by CMC on the "doctrine of advances," which was presented for the first time by Plaintiff (as grounds for a maritime lien) at said hearing. CMC filed a brief with regard to the doctrine on April 20, 2009, stating that it does not apply. (Doc. 71).

## III.  Analysis

### A.  Relevant Law

Rule C(1)(a) of the Supplemental Admiralty Rules provides that a plaintiff may initiate "[a]n action in rem . . . to enforce any maritime lien . . . ."[5] Rule C is a true *in rem* proceeding and access

---

[5] "The maritime lien is a unique security device which serves the dual purpose of keeping ships moving in commerce while not allowing them to escape their debts by sailing away." Electra Intermodal Servs., Inc. v. M/V Nan Kou, 1993 WL 379583, *2 (S.D. Fla. 1993). As noted in Sembawang Shipyard, Ltd. v. Charger, Inc., 955 F.2d 983, 986 (5th Cir. 1992):

to a proceeding *in rem* under Rule C is restricted to plaintiffs who hold a maritime lien or who can show that "a statute of the United States provides for a maritime action *in rem* or a proceeding analogous thereto." Sembawang Shipyard, Ltd. v. Charger, Inc., 955 F.2d 983, 987 (5th Cir. 1992). Rule C(3)(a)(ii) authorizes the district court to issue a warrant to arrest a vessel or cargo that is the subject of an *in rem* action. In Trinidad Foundry and Fabricating v. M/V K.A.S. Camilla, 966 F.2d 613 (11th Cir. 1992), the Eleventh Circuit explained that Rule C provides the jurisdictional basis for an *in rem* action to enforce a maritime lien in federal district court:

> Rule C(1)(a) is procedural and sets forth the means to file an in rem action to enforce a maritime lien. The requirements of Rule C are to be read literally, and a vessel is not considered to be within the court's *in rem* jurisdiction when the rule has not been complied with, absent an agreement between the parties to the contrary. However, maritime liens are not created by Rule C. Instead, they are an aspect of substantive, rather than procedural maritime law.

Id. at 615 (citations omitted). Therefore, if a plaintiff in a Rule C action does not possess a valid maritime lien, the district court lacks *in rem* jurisdiction.

A party disputing a Rule C arrest may request a post-attachment hearing under Supplemental Admiralty Rule E(4)(f).[6] "The post-arrest hearing is not intended to resolve definitively the dispute between the parties, but only to make a preliminary determination whether there were reasonable

---

Access to a proceeding *in rem*, under Rule C, is rigorously restricted. Traditionally, the plaintiff must hold a maritime lien. See THE RESOLUTE, 168 U.S. 437, 440, 18 S.Ct. 112, 113, 42 L.Ed. 533 (1897); Supplemental Rule C(1)(a). Additionally, a plaintiff may proceed under Supplemental Rule C "[w]henever a statute of the United States provides for a maritime action in rem or a proceeding analogous thereto." Supplemental Rule C(1)(b).

[6] According to Rule E of the Supplemental Admiralty Rules, "[w]henever property is arrested . . . any person claiming an interest" in the property may challenge the arrest at a hearing "at which the plaintiff shall be required to show why the arrest or attachment should not be vacated." FED.R.CIV.P. SUPP. E(4)(f). Rule E(4)(f) gives the defendant or other person with an interest in the property a right to a prompt post-seizure hearing at which he can attack the complaint, the arrest, the security demanded, or any other alleged deficiency of the proceedings.

grounds for issuing the arrest warrant, and if so, to fix an appropriate bond." Salazar v.. Atlantic Sun, 881 F.2d 73, 79 (3d Cir. 1989). At the Rule E post-attachment hearing, the plaintiff bears the burden of proving why the attachment should not be vacated – *i.e.*, the plaintiff must prove that the attachment was, and is, supported by "probable cause." Id. See also Twentieth Century Fox Film v. M.V. Ship Agencies, 992 F. Supp. 1423, 1427 (M.D. Fla. 1997).

**B.     Discussion**

Plaintiff originally asserted a maritime lien on the cargo based upon its claim that CMC owed demurrage charges which had been incurred in Virginia, as well as for a one day demurrage charge incurred in Mobile, Alabama. However, at the Rule E(4)(f) hearing Plaintiff stated that the maritime lien claim against the cargo is no longer based on the demurrage charges incurred in Virginia, but rather is limited to the demurrage charge incurred once the vessel arrived in Mobile, Alabama. Upon consideration of the facts, it is now evident to the undersigned that Plaintiff's request to arrest the cargo was granted in error based on the court's misunderstanding of the facts. Simply put, Plaintiff has not provided any factual or legal basis for its assertion of a maritime lien.

Plaintiff asserts that CELSA and CMC formed a contract for the sale of steel (the CELSA-CMC Purchase Agreement), and that based upon and because of that contract, Plaintiff was engaged to carry cargo on the M/V SATURNUS from Spain to the United States to be received by CMC. Plaintiff argues that although the CMC-CELSA Purchase Agreement is a non-maritime contract, the CMC-CELSA agreement has a severable maritime component (to ship and transport the steel cargo by vessel overseas). Plaintiff claims that it is a third party beneficiary of "the severable maritime portion of [the CMC-CELSA Purchase Agreement] . . . wherein Barna provided its services to carry the steel over the sea [which] is maritime in nature." In support of this contention, Plaintiff also

7

relies upon the Oldendorff-Plaintiff Charter Contract (to which neither CELSA nor CMC is a party) "under which Bills of Lading were issued for the cargo." Plaintiff claims that "[t]he Bills of Lading were issued by Oldendorff to Barna, and consigned to CMC. The bills of lading were part and parcel of the maritime contract to transport cargo by sea." Further, Plaintiff claims that with CMC as the Consignee on the Bills of Lading, "privity exists for Barna to make direct contractual claims."

As to the CELSA-CMC contract, Plaintiff has presented no evidentiary basis to assert a maritime lien for demurrage. A maritime lien affords protection to a party who has been injured by breach of a maritime contract. Bargecarib Inc. v. Offshore Supply Ships Inc., 168 F.3d 227, 230 (5th Cir. 1999). The only evidence submitted regarding the CELSA-CMC contract is in the form of incomprehensible e-mails between unknown persons. (Doc. 66 at Ex. A). The Plaintiff asserts that there is a maritime shipping component to the contract to which Barna is a third-party beneficiary. Plaintiff further asserts that CMC breached the maritime component of the contract. However, the Plaintiff has failed to point to any terms in the e-mails which relate to shipping or Plaintiff's participation in the shipping component. Thus, Plaintiff's claim of a maritime lien fails in the first instance for lack of evidentiary support.

Plaintiff next points to the Bills of Lading as a basis for its maritime lien against CMC's interest in the cargo. "A Bill of Lading is a 'document which is signed by the carrier or his agent acknowledging that goods have been shipped on board a specific vessel that is bound for a particular destination and stating the terms on which the goods are to be carried . . . .'" Hale Container Line, Inc. v. Houston Sea Packing Co., Inc., 137 F.3d 1455, 1462, n. 12 (11th Cir.1998) (quoting THOMAS J. SCHOENBAUM, 2 ADMIRALTY AND MARITIME LAW § 10-11 at 44 (2nd ed. 1994)). The Bill of Lading in this case indicates that CELSA is the Shipper and CMC is the Consignee. The Bill of

Lading was signed by Olendorff's agent as the Carrier. The Bill of Lading provides that the freight was prepaid. While the Bill of Lading references the Oldendorff-Plaintiff Charter Contract as the terms under which the freight is payable, the Bill of Lading itself does not provide Plaintiff a basis for asserting a maritime lien against the cargo based on demurrage charges.

The Court next looks to the Oldendorff-Plaintiff Charter for a possible basis for Plaintiff's claim for a maritime lien based on breach of contract by CMC. The Oldendorff-Plaintiff Charter is no doubt a maritime contract. Further, a demurrage charge can be a basis for a maritime lien against the cargo. Gulf Puerto Rico Lines, Inc. v. Associated Food Co., Inc., 366 F. Supp. 631, 635 (D.C.P.R. 1973). Moreover, Oldendorff, as a disponent owner, "can acquire the security of a lien on sub-freights or, as in this case, demurrage, by including in the charter-party a clause so providing and by requiring the sub-charterer to include a like clause in its Bill of Lading or to incorporate the clause in the Bill of Lading by reference to the charter-party." Oceanic Trading Corp. v. Vessel Diana, 423 F.2d 1, 5 (2d Cir. 1970). In this case, the Charter Contract's lien clause unequivocally specifies that Oldendorff has a lien on the cargo. However, the fact that Oldendorff may have a lien on the cargo does not provide a basis for Plaintiff to assert a maritime lien on the cargo. It is noted that in the Charter Contract, it is Plaintiff who is liable to Oldendorff for the demurrage charges.[7]

At the recent Rule E hearing, Plaintiff has further muddied the water by asserting that it is entitled to a maritime lien pursuant to the "doctrine of advances." Plaintiff claims that by virtue of its payment of the $15,000/per day demurrage charges to the vessel's owner, as required under its Charter Contract with Oldendorff, it has acquired a lien against the cargo. However, as the water

---

[7] It is apparent that Oldendorff intended to protect itself primarily by requiring payment of any demurrage from the sub-charterer Plaintiff and then providing additional protection by preserving the right to assert a lien against the cargo.

clears, it is evident that the doctrine of advances does not provide the ballast with which to steady Plaintiff's unstable Rule C arguments. In short, the doctrine of advances is inapplicable.

The doctrine of advances arises out of the common law and awards a lien to non-owners who do not provide necessaries, but instead satisfy an outstanding or future lien, typically by paying for necessaries provided by a third party. See, e.g., Mullane v. Chambers, 438 F.3d 132, 137-138 (1st Cir. 2006). Cf. Dresdner Bank AG v. M/V OLYMPIA VOYAGER, 465 F.3d 1267 (11th Cir. 2006) (finding that under CIMLA (the Commercial Instruments and Maritime Lien Act), a party supplying necessaries to a ship in a US port, on the authorization of the owner or a person authorized by the owner, is entitled to a maritime lien). Under the maritime lien statute, a person obtains a maritime lien if he or she provides "necessaries" by "furnishing 'goods or services'" that permit the "continued operation" of the vessel in commerce. The rule of advances facilitates reimbursement to those people whose actions permit a vessel to continue to function. Mullane, 438 F.3d at 137. "[T]he rule of advances provides protection not to the person furnishing 'necessaries,' but rather to a third person who pays for the goods and services that would have given rise to a statutory maritime lien, on an assurance that the vessel will be responsible for the debt." Id. Maritime liens created pursuant to the rule of advances are intended "to safeguard the interests of 'strangers to the vessel,' not vessel owners or those who can control the vessel's affairs." Id. at 137-138.

Case law makes clear that the doctrine of advances is intended to subrogate parties who advance funds to a vessel for the acquisition of "necessaries" to the interest of those who would ordinarily have lienable claims for the provision of such "necessaries." See, e.g., Crustacean Transp. Corp. v. Atalanta Trading Corp., 369 F.2d 656 (5th Cir. 1966). Here, Plaintiff claims that CMC is indebted to Oldendorff for demurrage. In fact, pursuant to the contract it is Plaintiff who is indebted

to Oldendorff for demurrage. However, despite who is indebted for the demurrage, no authority has been presented that demurrage is a necessary. Thus the doctrine of advances does not apply. Furthermore, even if demurrage was a necessary, Plaintiff has provided no evidentiary support for its claim that it has paid the demurrage charges.[8]

### IV.     Conclusion

Based upon the foregoing, the Court finds that the Rule C arrest of the cargo is **VACATED.** Accordingly, to the extent the Defendant's motion (Docs. 39, 40) requests that the warrant of arrest by vacated, the motion is **GRANTED.**   All other relief requested in the motion is **MOOT.**

**DONE** this the **28th** day of **April 2009.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**

---

[8] While Plaintiff's counsel orally represented to the Court at the Rule E(4)(f) hearing that it has made demurrage payments to Oldendorff, CMC's counsel has represented in its written submission to the Court that it "has learned from counsel for Oldendorff that the demurrage charges have not, in fact, been paid." (Doc. 71 at 4).

11